UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 286 |
| v. | |
| XAVIER ELIZONDO, and DAVID SALGADO | Hon. Matthew Kennelly |

**GOVERNMENT'S MOTION TO ADMIT EVIDENCE
PURSUANT TO FED. R. EVID. 801(d)(2)(E)**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,

United States Attorney for the Northern District of Illinois, moves this Court to admit

certain statements against defendants Xavier Elizondo and David Salgado pursuant

to Fed. R. Evid. 104(a), 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128

(7th Cir. 1978).

## I.   INTRODUCTION

This submission begins by providing an overview of the conspiracies that will

be established at trial. It then discusses the law governing the admissibility of

coconspirator statements under Rule 801(d)(2)(E), and outlines some of the evidence

establishing the conspiracy in this case. Finally, it summarizes the evidence

supporting the admission of coconspirators' statements. Based on the following, the

government seeks admission of statements pursuant to Rule 801(d)(2)(E) and

requests a pretrial ruling of admissibility from the Court, in accord with *United States

v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978), and established practice in this

Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States*

1

*v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

## II.    OVERVIEW OF THE CHARGED CONSPIRACIES

The superseding indictment charges two closely related, overlapping conspiracies. Count One charges that between approximately July 2017 and January 2018, defendants Xavier Elizondo and David Salgado conspired with one another and with others, including Individuals A and B (who, as explained below, served as false J. Doe affiants for Elizondo and Salgado), to commit an offense against the United States, namely, to embezzle, steal, obtain by fraud, and convert without lawful authority property in the care, custody, and control of the Chicago Police Department, in violation of 18 U.S.C. § 666(a)(1)(A), in violation of 18 U.S.C. § 371. The conspiracy set forth in Count One alleges that defendants knowingly submitted materially false J. Doe search warrant applications to Cook County judges; directed and caused J. Doe affiants to commit perjury in support of the warrants; stole and otherwise misappropriated money, drugs, and cigarettes recovered during the execution of J. Doe search warrants; illegally paid informants with materials recovered during searches, including narcotics; and took steps to conceal the conspiracy, including by hiding and/or destroying evidence contained in Salgado's home and on each defendant's cellphone.

Count Two charges that between approximately July 2017 and December 2017, defendants Elizondo and Salgado conspired with one another and with others, including Individuals A and B, to violate the Fourth Amendment rights of certain Chicago residents by obtaining J Doe search warrants through the presentation of

knowingly false information to Cook County judges, in violation of 18 U.S.C. § 241.

The government expects to introduce evidence of defendants' and others' membership in the conspiracy and statements made by defendants and other co-conspirators, including Individuals A and B, in furtherance of the charged conspiracies. The government will establish defendants' and others' membership in the charged conspiracies through cooperator testimony, victim/witness testimony, consensual recordings, judicially authorized Title III intercepted communications, and corroborating evidence to include cell phone location data, video evidence, and documentary evidence. As described below, this evidence includes statements that Individual A made to an FBI cooperating source (CS-1) about the nature and history of the conspiracy while attempting to recruit CS-1 into the conspiracy, consensually recorded conversations in which Elizondo (in the presence of Salgado) discussed their practice of paying informants with a "cut" of whatever materials were recovered during searches, and intercepted conversations in which Elizondo directed Salgado to remove evidence from Salgado's home after it came to light that they were being investigated. The government seeks to introduce these statements at trial because defendants and others were members of the charged conspiracies and these coconspirator statement were made in furtherance of the charged conspiracies. For the reasons set forth below, the Court should grant the government's motion.

## III. GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course

and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

## A. Existence of and Membership in the Conspiracy

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978) and Rule 104 of the Federal Rules of Evidence, the trial judge may preliminarily determine whether statements by a coconspirator of the defendant will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . ." *Id*. at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the finder of fact may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

---

[1] No Sixth Amendment confrontation issues arise from the use of a non-testifying coconspirator's statements, offered for their truth against a defendant, as such statements are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial); *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005) ("*Crawford* did not change the rules as to the admissibility of coconspirator statements.").

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., Alviar*, 573 F.3d at 540.

Under *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met. Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a

defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme). Of course, in many cases, statements by an alleged coconspirator and the cooperating source will include a combination of declarations offered for the truth of the matters asserted and declarations offered for other non-hearsay purposes. In some instances, such statements could be admissible simply because they provide context for defendant's own admissions. *See generally United States v. Wright*, 722 F.3d 1064, 1067 (7th Cir. 2013).

at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator or schemer. *Longstreet,* 567 F.3d at 919; *United States v. Jones*, 275 F.3d at652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990); *United States v. Potts*,

840 F.2d 368, 372 (7th Cir. 1987) (citing cases) A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995); *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B. The "In Furtherance of" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of

the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, at *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

    a.    to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[3]

    b.    to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

    c.    to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

    d.    as an assurance that a coconspirator can be trusted to perform his role, *Sophie*, 900 F.2d at 1073-74; *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

    e.    to inform and update others about the current status of the

---

[3] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

   f. to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

   g. to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also Maloney*, 71 F.3d at 659-60;

   h. to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

   i. to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

   j. "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

   k. to attempt to recruit new members into the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925,

926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## IV. EVIDENCE REGARDING EXISTENCE OF CHARGED CONSPIRACY AND DEFENDANTS' PARTICIPATION IN THE CONSPIRACY

At the time of the charged conspiracies, defendant Xavier Elizondo was a CPD sergeant and leader of a gang enforcement unit assigned to the CPD's 10th District. Defendant David Salgado was a line police officer assigned to Elizondo's unit. The government's evidence will establish that Elizondo and Salgado conspired with one another and with others, including Individuals A and B, to steal, fraudulently obtain, and otherwise misappropriate items recovered during searches they conducted in their capacity as law enforcement officers, and to violate the Fourth Amendment rights of certain Chicago residents by obtaining J. Doe search warrants through the knowing provision of false information to Cook County judges.

### A. Testimony of the Defendants' Former Confidential Informants

At trial, the government will offer the testimony of at least two former confidential informants who served as J. Doe affiants for Elizondo and Salgado, Individual A and Individual B.

Individual A will testify that he worked as a confidential informant for Elizondo and Salgado between October 2017 and January 2018, and served as a J. Doe affiant on multiple occasions during this period. The government expects Individual A to testify that, on at least two occasions (including December 19, 2017, discussed in detail below), Elizondo and Salgado instructed Individual A to provide false information to a Cook County judge in support of J. Doe search warrants for

11

local residences. Individual A will also testify that Elizondo paid Individual A for serving as a J. Doe affiant with cash, narcotics (including ecstasy and PCP), and cartons of cigarettes.

Individual A will testify that, at times, Elizondo paid Individual A, or discussed payments to Individual A, in Salgado's presence. Individual A will further testify that on one occasion, Elizondo met Individual A with a police officer other than Salgado. On that occasion, Elizondo told Individual A not to discuss how Elizondo paid Individual A because, Elizondo explained to Individual A, "He's [the other officer] not like us, he's not cut from the same cloth."  Individual A will further testify that, on several occasions, Elizondo explained to Individual A that he was paying Individual A with materials recovered during the execution of J. Doe search warrants.

Beginning in or around October 2017, Individual A attempted to recruit an associate of his into the conspiracy. Unbeknownst to Individual A, his associate was working as an FBI confidential informant (CS-1).  Between approximately October and December 2017, Individual A and CS-1 had a number of conversations, some of which were consensually recorded, in which Individual A told CS-1 that Individual A provided information to certain Chicago Police Department officers in exchange for money, narcotics, and other materials that the officers recovered from search locations. According to CS-1, Individual A described several residences for which Individual A claimed to have recently provided information to CPD officers in support of J. Doe search warrants, and detailed to CS-1 what items the officers recovered during the searches, and what portion of the recovered items the officers gave to

Individual A as payment for information.

Based on Individual A's conversations with CS-1, FBI agents searched CPD records and found several J. Doe warrants that defendant Elizondo's CPD gang enforcement unit had recently executed that appeared to generally correspond with the information Individual A provided to CS-1. The government intends to introduce these J. Doe warrants as evidence at trial. During the early conversations with CS-1, Individual A also urged CS-1 to meet with Individual A's CPD handlers and provide them with information in support of search warrants, so that CS-1 and Individual A could together receive future payments from the officers, including cash and narcotics. The government anticipates that Individual A will offer consistent testimony about his early conversations with CS-1, and further testify that he was sharing the information with CS-1 for purposes of recruiting him into the conspiracy. CS-1 and Individual A's expected testimony is corroborated by the consensual recordings of some of these early conversations.

Based on all of this information, FBI agents formulated the first undercover ruse search scenario of the Subject Apartment, which is described in detail below.

The government will also offer the testimony of Individual B. The government expects Individual B to testify as follows: Individual B worked as a confidential informant for Elizondo beginning in or around 2008. In or around the summer of 2017, Elizondo began working with Salgado. Prior to working with Salgado, Elizondo never asked Individual B to provide false information in support of J. Doe search warrants. Shortly after Elizondo began working with Salgado, Elizondo began calling

Individual B and asking her to stand in as an affiant on J. Doe warrants, even though Individual B had not provided Elizondo with any information. Individual B understood Elizondo to be asking her to lie to the judges. According to Individual B, she ultimately never provided false information to a judge for Elizondo because, on the occasions Elizondo asked her to stand in, Elizondo later called Individual B and told her that he had found someone else to serve as the affiant.

The government expects Individual B to testify that, on at least two occasions in or around the summer of 2017, Salgado directed Individual B to provide false information to a judge in support of a J. Doe search warrant. According to Individual B, Elizondo was not present when Salgado instructed her to lie to judges. After the second time Salgado asked Individual B to lie to a judge, however, Individual B called Elizondo and told him that Salgado was directing her to provide false information to judges in support of search warrants. According to Individual B, Elizondo told her to do as Salgado instructed.

Individual B will testify that Salgado paid her for providing false information to judges with narcotics, alcohol, and cartons of cigarettes. Specifically, on one occasion in or around November 2017, Individual B met with Salgado in a Jewel Osco parking lot in the area of Ashland and Roosevelt, and Salgado provided her with a plastic bag filled with marijuana, a bottle of liquor, and several cartons of cigarettes. The government will also offer the testimony of Individual B's daughter, who accompanied Individual B to the parking lot and waited in the car while Individual B met with Salgado, to corroborate that Individual B received marijuana, liquor, and

14

cigarettes at the parking lot meeting. The government will also offer historical cell site data and text messages recovered from Salgado and Individual B's phones to corroborate that this meeting took place.

The government also expects Individual B to testify that, in or around January 2018, Elizondo arrested Individual B's cousin, Individual C (CPD records and Individual C's own expected testimony corroborate this). Individual B and C will testify that, after Individual C's arrest, Individuals C provided Elizondo with information about a marijuana dealer who sold out of his sister's (Individual D) residence on Central Park Avenue in Chicago, but who did not live there. Individual C will testify that he specifically told Elizondo that Individual D had no involvement selling marijuana, only Individual D's brother was involved.

The government will present evidence that Individual C was incarcerated at the time that Elizondo and Salgado sought to obtain a J. Doe search warrant for the Central Park Avenue residence. Individual B will testify that she was originally going to stand in as a dummy affiant for Elizondo and Salgado since Individual C was unavailable, but Salgado decided to use someone else because he did not want to pay Individual B. Instead, the evidence will show that Salgado, with Elizondo's knowledge and approval, directed a different third party to falsely pose as a J. Doe affiant to obtain a warrant. As part of this fraud, Salgado drafted, and Elizondo approved, a materially false search warrant complaint which stated that the dummy J. Doe affiant had purchased marijuana directly from Individual D. The government will offer this materially false warrant as evidence at trial.

The government will also seek to offer recordings of several intercepted conversations between Elizondo and Individual B, including ones that took place on the evening of January 27, 2018, immediately before and after Elizondo, Salgado, and other officers executed the J. Doe search warrant at the Central Park Avenue residence.[4] In one conversation that occurred at 10:12 p.m., immediately after the officers finished searching the Central Park Avenue residence, Elizondo and Individual B discuss the fact that Individual C—<u>not</u> the J. Doe affiant—provided Elizondo with information about narcotics activity at the Central Park residence. Individual B also expresses relief that she did not serve as the dummy affiant, because the information provided by Individual C turned out to be incorrect:

> Individual B: Did you find what y'all was looking for in the house?
>
> Individual B: Cause I no y'all hit it.
>
> Elizondo: Nah. We hit 2d fl. We think it was on 1st floor. They were all deep in there.
>
> Individual B: Dam. Wrong house.
>
> Individual B: Well that's where she [Individual D] stay it was just the wrong house ha. [Individual C] told y'all what floor tho right[?]
>
> Individual B: Glad I did not go see no judge on that one.
>
> Elizondo: He [Individual C] told us 2nd floor.

The above conversation demonstrates that—consistent with Individual C's

---

[4] On or about January 18, 2018, Chief Judge Ruben Castillo issued an order authorizing the interception of wire and electronic communications over Elizondo's cellphone for a period of 30 days. Additional intercepted conversations are discussed in further detail below.

expected testimony—it was Individual C (who was incarcerated at the time), not the dummy J. Doe affiant, who provided information to Elizondo about drug dealing at the Central Park Avenue residence. Similar to the December 19, 2017 undercover scenario, however, because Individual C was unavailable to serve as the affiant, Salgado and Elizondo used a dummy affiant to provide materially false information to secure the warrant.

### B.    Evidence Obtained through Undercover Operations

In December 2017 and January 2018, the FBI conducted two undercover operations for purposes of investigating allegations of misconduct within Elizondo's CPD gang enforcement team. In the first scenario, in December 2017, CS-1 provided Elizondo and Salgado with ruse information about drug trafficking activity at an apartment on Chicago's west side (the "Subject Apartment"). As explained in detail below, Elizondo and Salgado later obtained a materially false J. Doe warrant to search the Subject Apartment, and planned to misappropriate money recovered inside the apartment until they realized they were under surveillance. In the second scenario, in January 2018, CS-1 provided Elizondo with ruse information about drug trafficking activity involving a rental vehicle (the "Subject Vehicle"). As set out below, Elizondo and Salgado later searched the rental vehicle and stole $4,200 that the FBI had hidden inside the trunk. The following day, when Elizondo and Salgado learned they were under investigation in connection with the Subject Vehicle search, Elizondo instructed Salgado to remove evidence from Salgado's home.

17

i.    *The Subject Apartment Ruse Search*

On December 18, 2017, Individual A introduced CS-1 to defendants Elizondo and Salgado, whom Individual A identified as the officers with whom he had been dealing. During the meeting, which was audio recorded, CS-1 told Elizondo and Salgado the ruse information that the FBI had given CS-1, specifically, that the Subject Apartment served as a stash house for two Puerto Rican brothers, whom CS-1 knew as "David Hernandez," a/k/a "Big Bum," and Hernandez"s brother, "Little Bum." CS-1 further stated that he purchased pound quantities of marijuana from the brothers at the Subject Apartment. CS-1 further stated that he had been inside the Subject Apartment at approximately 3:30 p.m. earlier the same day, and saw approximately 3 kilos of cocaine and $25,000 in cash. CS-1 further stated that he purchased two pounds of marijuana from Hernandez that day, and resold it for an $800 profit. CS-1 also provided a physical description of Hernandez. Individual A did not provide Elizondo or Salgado with any information in relation to the Subject Apartment during this meeting.

After CS-1 provided the ruse information, Elizondo stated several times, in Salgado's presence, that they would give CS-1 and Individual A a portion of whatever materials the officers recovered inside the Subject Apartment. Specifically, Elizondo stated, "Yeah, so we're the police, but we like to do business. In order for us to be successful, and not mess with, I mean, people got to eat man, everybody got to eat." Individual A then explained to CS-1, "They gonna give us our chop off of everything we do." CS-1 then asked for further clarification: "So, out of what's in the house, we

got, what's uh, me and [Individual A]'s cut?" Elizondo replied, "It depends whatever's in the house, you know, I don't want to…", at which pointed Salgado interjected, "Stick your foot in your mouth." Elizondo then continued to elaborate: "You know what I mean? If there's $100 in there, you know what I mean, I'm not going to give you $10 each, you know what I mean? That's bullshit. And I'm just using a number here, I'm not, you know what I mean? Like, it's got to be worth . . . your efforts."

Later in the conversation, Elizondo stated, "Let's say some dude flips, and he gives up another motherfucker, we roll on it, we knock it down . . ." CS-1 asked, "Then I get some of that too?" Elizondo answered, "It all comes back to the originator," meaning Elizondo and Salgado would provide CS-1 and Individual A with materials recovered from any later searches that resulted from the search of the Subject Apartment.

Later in the conversation, Elizondo stated, "If we can get, get the product, and/or the guns off the street, that's our deal dude, that's what we're supposed to do. You know, whatever falls out of the bag, you know what I mean, at the end, whatever, you know what I mean . . . However that goes down, dude, that's, you know what I mean? That's, I don't care if, motherfucker got $500 on him, you know what I mean? We get the dude with a pistol and he got the other [implying money] . . . fuck it, he ain't going to need it! You know what I mean?," meaning that Elizondo and Salgado were willing to misappropriate money recovered during search warrants so long as they could seize guns and drugs. Individual A responded, "He's [Elizondo] saying whatever they get out of it, they gonna give us our chop . . . Whatever's in there, they

19

gonna give us our chop man. Whatever it is, money, cocaine, they give us all that." Elizondo and Salgado did not respond to this particular comment by Individual A.

At the end of the December 18, 2017 meeting, Elizondo stated to CS-1, "I'm the man who makes the deals and cuts the deals." CS-1 asked, "But I'm going to get paid and it's going to be worth my while?" Elizondo responded, "Whatever you said is in there is a piece of your cut. However you break it down between the two of you [CS-1 and Individual A] is your business."

At trial, the government will introduce the consensual audio recording of the December 18, 2017 meeting. CS-1 and Individual A will also testify about the December 18, 2017 meeting, including their understanding from Elizondo's statements that Elizondo and Salgado intended to give them a portion of whatever materials they recovered inside the Subject Apartment as payment for the information that CS-1 provided.

On December 19, 2017, during a consensually recorded phone call, Individual A told CS-1 that it was time for CS-1 to appear before a judge to swear out a J. Doe warrant for the Subject Apartment. At agents' instruction, CS-1 refused to appear before a judge. In a later consensually recorded call, Individual A stated that he was going to stand in for CS-1 as the J. Doe affiant—"I'm gonna do it now, shit. . . . . I'm gonna do it now, you took too motherfucking long"—even though Individual A had provided no information to Elizondo and Salgado regarding the Subject Apartment. The government will offer the recordings of these phone calls at trial.

The government anticipates Individual A will testify at trial that, after CS-1

refused to appear before a judge, Individual A notified Elizondo and Elizondo instructed Individual A to meet him in the area of 21st and Western Street in Chicago. Individual A will further testify that he traveled to the area of 21st and Western Street, where he met with Elizondo and Salgado at which time Elizondo and Salgado instructed Individual A to appear before a judge and provide false information in support of a J. Doe warrant for the Subject Apartment. Individual A will further testify that Elizondo and Salgado then transported Individual A to meet with a judge, and, at Elizondo and Salgado's instruction, Individual A swore to the veracity of the false information contained in the search warrant complaint.

At trial, the government will introduce the false J. Doe search warrant complaint for the Subject Apartment that Salgado presented to the Cook County judge ("Judge A") on December 19, 2017. The search warrant complaint lists Salgado as the officer affiant. The complaint is replete with information that was false and materially different from what CS-1 told Elizondo and Salgado the previous day. The government will also offer the testimony of Judge A, who is expected to testify that on December 19, 2017, Salgado presented the J. Doe warrant complaint to Judge A outside of a Smith and Wolensky's restaurant in the River North area, that Judge A examined Salgado and Individual A, and that Judge A found probable cause and issued a warrant for the Subject Apartment based on the information provided by Salgado and Individual A.

The government will also offer historical cell site information to show that Elizondo was in the same area as Salgado and Individual A when they presented the

21

false information to Judge A. This will include historical cell site records to show that, consistent with Individual A's testimony, Elizondo was in the area of 21st and Western shortly before the J. Doe warrant was signed, and then traveled to the River North area and was in the vicinity of the Smith and Wolensky's restaurant at the time Judge A signed the warrant.

On or about December 20, 2017, Elizondo, Salgado, and several other CPD officers executed the J. Doe search warrant at the Subject Apartment. At trial, the government will offer consensual video recordings of the search, as well as several consensually recorded phone calls between Elizondo and CS-1 that took place during the search, in which CS-1 (at the FBI's direction) directed Elizondo toward the location where the $15,000 that the FBI had planted was hidden. The video recording shows that Elizondo and Salgado were the only officers who searched the immediate area where CS-1 told Elizondo the money was hidden, and later depicts Elizondo and Salgado jointly recovering the money. The government will offer CPD records to show that Elizondo and Salgado inventoried the full $15,000 recovered.

The government will offer additional evidence, however, to show that the reason Elizondo and Salgado inventoried the entire $15,000, as opposed to misappropriating some or all of it, was because they discovered the FBI's hidden surveillance equipment after recovering the $15,000, and incorrectly believed that the drug dealers who purportedly lived at the stash house had been surveilling them. Specifically, the government will offer a December 28, 2017, consensually recorded phone call between CS-1 and Elizondo, in which Elizondo explained that "we,"

22

meaning Elizondo and at least one other officer, had to properly inventory the money (as opposed to divert a portion to CS-1 and Individual A) because of the cameras the officers discovered inside the Subject Apartment.

During the call, which was consensually recorded, CS-1 stated, "What's going on man, I just talked to [Individual A]. . . Everything still good?" Elizondo responded, "Yeah, everything's good man, it's just that last thing had cameras, man. I don't know if you knew that." CS-1 asked, "It did?" Elizondo stated, "Yeah dude! . . . I showed [Individual A] the pictures of the camera, the system." Elizondo further stated, "Everything that we found, when you told us where it was at, it got inventoried my man. Nothing, not a penny went nowhere else. It went in, because we didn't know what was up." Later in the conversation, Elizondo stated, "[T]here was 15 [$15,000], exactly where you told us, trust me. As soon as I got off the phone with you, I was on the phone with you when we pulled it out. You know what I mean? When we got those cameras and all that other shit, I said, 'Man, we got to do this on the straight,' so . . . you know."

Later in the conversation, Elizondo stated, "If there wasn't no cameras, if we didn't find it, those cameras, and I'm glad we did, but if we didn't man, it would have been a good Christmas for everybody, you know what I mean?" CS-1 responded, "Damn man! Shit." Elizondo continued, "So that's all it is my man, I ain't, I ain't, trust me, you know . . . People got to eat, you know what I mean?" CS-1 stated, "Yeah. So ok man, uh, I got my eye on something, right? But I want to make sure, I'm listening to 'Twan, I don't know what the fuck, I got to make sure that, like you said,

23

it's worth everybody's while. So, I guess that means the more shit . . ." Elizondo interjected, "No, hey man, it's gotta be, it's gotta be, well yeah, it's gotta, you know, hey man, if you're the one coming up with the, with the location, it's gotta be worth your while, number one. Obviously, we want to get our piece of the, you know, we go 'head and inventory our stuff, that looks pretty. But whatever doesn't go down, you know what I mean? You know, I ain't gonna tell you how to cut your deal, you know what I mean, on your end. That's none of my business, so . . . But you got my number my man, so, you know what I mean?"

      *ii.*    *The Subject Vehicle Ruse Search*

On or about January 28, 2018, the FBI initiated a second ruse search scenario as part of its investigation into Elizondo and his CPD unit. At the direction of agents, CS-1—during intercepted and consensually recorded phone calls—provided Elizondo with ruse information regarding a mobile drug dealing operation involving a series of drop cars where drugs and drug proceeds were stored around the city. CS-1 told Elizondo that one such drop car—a grey Hyundai sedan—was then located in the parking lot of a motel on Chicago's southwest side. In fact, the grey Hyundai was an Enterprise rental car obtained by the FBI (the "Subject Vehicle"), in which agents had secreted $18,200 within a side panel of the trunk. Agents planned to monitor the Subject Vehicle search and determine whether Elizondo, Salgado, and/or other officers misappropriated any of the money after recovering it inside the Subject Vehicle.

On the evening of January 28, 2018, Elizondo, Salgado, and CPD officers Joe Treacy and Jose Sanchez arrived on scene at the motel and located the Subject

Vehicle. At trial, the government will present a video recording of the initial search of the Subject Vehicle at the motel parking lot. The video depicts Elizondo searching the trunk of the vehicle and locating the money that agents had stashed in the side trunk panel. Rather than call it out to the other officers (who were in the vicinity but were not looking inside the trunk), however, Elizondo appears to surreptitiously motion to Salgado only. Salgado comes over to the trunk, and Elizondo shows him the money. Neither Elizondo nor Salgado informed Treacy or Sanchez of the discovery, nor did they recover the money at that time (this is apparent from the video, and the government expects Treacy and Sanchez to so testify at trial). Instead, Elizondo appears to stuff the money into a different side panel on the opposite side of the trunk from where it was recovered, and close the trunk.

The government will offer independent evidence of CPD officer training and practices to establish that this was a highly unusual and inappropriate way for Elizondo and Salgado to handle evidence—they should have called out the discovery to their team members, photographed the evidence at the location where it was recovered, and then recovered it on the spot by removing it from the trunk and placing it into an evidence bag.

The video then depicts Elizondo and Salgado talking privately with one another. Next, the video shows Elizondo and Sanchez returning to their CPD vehicle, Treacy returning to his CPD vehicle, and Salgado entering the Subject Vehicle (Elizondo had previously found the keys for the vehicle hidden above the rear right tire, where CS-1 told Elizondo they would be). The three vehicles then pull out of the

motel parking lot in tandem, and travel to the back parking lot of a nearby business called Amigos Frozen Foods. The government expects Treacy and Sanchez to testify that they were not involved in the decision to move the Subject Vehicle from the motel parking lot, and that they were following Elizondo's directions.

The government will offer evidence of the second search of the Subject Vehicle that took place in the Amigos Frozen Foods parking lot. The government expects Treacy and Sanchez to testify that Elizondo and Salgado were generally involved with searching the Subject Vehicle's trunk (were the $18,200 was located), and that Treacy and Sanchez were generally involved with searching the interior and front hood. Video surveillance recovered from Amigo's corroborates this testimony, though the camera vantage point is too distant to discern many other details of the search. Both Treacy and Sanchez will testify that, during the second search at Amigos, neither Elizondo nor Salgado called out that they had located money in the trunk; instead, Treacy and Sanchez learned that Elizondo and/or Salgado had recovered money inside the trunk only at end of the search when Salgado removed it from the trunk, which was unusual (typically, CPD officers alert other team members in the immediate vicinity when evidence is discovered). Toward the end of the search, two other CPD officers, Dan Pacelli and Mike Karczewski arrived on scene at Amigos to assist with the Subject Vehicle search.

The government expects at least two eyewitness officers to testify that, toward the end of the search, Salgado handed the money from inside the trunk to Elizondo, who bagged the money in a plastic bag found inside the rental vehicle and placed it

in the backseat of Elizondo's CPD enforcement vehicle. The video surveillance corroborates this testimony.

Minutes later, all six officers departed Amigos and returned to the motel to set up surveillance (Salgado drove the Subject Vehicle back to the motel). The government will present evidence that, during surveillance, Elizondo and Sanchez were set up in their unmarked CPD vehicle in an alley adjacent to the motel parking lot, and Salgado and Treacy were set up in their unmarked CPD vehicle across the street from the motel. The government will present video surveillance evidence and Sanchez's testimony to establish that, during the surveillance, Sanchez got out of the CPD vehicle and walked into the motel lobby to retrieve surveillance video. At that point, Elizondo was alone with the money inside his CPD vehicle for approximately 5 minutes.

The government will present an intercepted telephone call that Elizondo placed to Salgado during the time Elizondo was alone with the money in his CPD vehicle. During the call, Elizondo and Salgado discussed having a drug-sniffing canine inspect the Subject Vehicle and the seized money. Toward the end of the call, Elizondo stated, "And, uh, we're good, alright, you know what I mean?" Salgado stated, "Yeah." Elizondo replied, "You know what I mean?" Salgado responded, "Yeah." The government expects Officer Treacy to testify that he was seated next to Salgado during this phone call, and could hear both sides of the conversation. Treacy will testify that, from the moment Elizondo said, "We're good, you know what I mean?," it sounded to Officer Treacy like Elizondo and Salgado were trying to speak

27

in code about something. Officer Treacy will also testify that Salgado's demeanor changed noticeably at that point in the conversation—specifically, that he turned away from Officer Treacy and lowered his voice as though Salgado was trying to conceal that part of the conversation from Officer Treacy.

The government will offer witness testimony, including from Officers Treacy and Sanchez, about the events that unfolded later the same night at CPD's Homan Square office when the officers returned from the search. The testimony will establish that Elizondo carried the money from his CPD vehicle into Homan Square. The evidence will further establish that Elizondo and Salgado were alone with the money for several minutes inside their Homan Square office while Officers Treacy and Sanchez oversaw a canine search of the Subject Vehicle in the parking lot. Sanchez will testify that, when he returned from the canine search, Salgado directed him to count they money, and Sanchez counted a total of $14,000—$4,200 less than the $18,200 the FBI had placed inside the Subject Vehicle.

The government will offer further evidence that Salgado drafted, and Elizondo approved, a materially false police report regarding the search of the Subject Vehicle. Among other lies, the report falsely stated that Sanchez discovered the money inside the trunk of the Subject Vehicle when, in fact, as the video surveillance proves, Elizondo initially discovered the money, showed it to Salgado only, and then re-secreted it before directing the officers to relocate the Subject Vehicle to Amigos Frozen Foods. The materially false police report says nothing about the officers relocating the Subject Vehicle to Amigos.

28

On January 29, 2018, an FBI agent and a CPD Task Force Officer involved in this investigation traveled to Homan Square and recovered the $14,000 that the officers involved in the prior night's search of the Subject Vehicle had inventoried. The agent and TFO then went to the Homan Square parking lot to recover the Subject Vehicle. In the parking lot, while a tow truck was preparing to tow away the Subject Vehicle, the agent and TFO encountered Salgado, who was arriving for his evening shift. Salgado asked the TFO if he was with Enterprise rental car. The TFO told Salgado that he was with CPD Internal Affairs, and that he would soon be following up with Salgado. Immediately after this encounter, Salgado placed an intercepted phone call to Elizondo. During the call, Salgado told Elizondo that Internal Affairs had just towed the Subject Vehicle. Elizondo replied, "They did? Alright, ah . . . .well you know what to do, right?" Salgado responded, "Yeah." Elizondo stated, "Just relocate everything, alright?" Salgado stated, "Huh?" Elizondo replied, "Just relocate everything, you know?" Salgado responded affirmatively, "Mmm hmm."

Several minutes later, Salgado called Elizondo again and they discussed reaching out to other officers in Internal Affairs to determine whether and why they were under investigation. Elizondo stated, "Alright, just make sure whatever you have in your house isn't there no more, you know what I mean? Salgado responded, "Yeah, alright. Hey, ah . . . *Donde lo pongo* [Where should I put it]?" Elizondo answered, "Ah . . . I don't know, just give me a minute, he's calling me back right now, I gotta answer the phone."

The government will present evidence, including historical cell site data, to

29

show that immediately after these two calls were placed, Salgado left Homan Square and returned to his home.

### C.. __Victim Testimony__

The government intends to offer the testimony of several Chicago residents who were the victims of the fraudulent search warrants obtained by Elizondo and Salgado, and/or who had items stolen from them during the resulting searches. For example, the government anticipates that Individual E will testify that on January 12, 2018, Elizondo, Salgado, and several other CPD officers searched her residence in Chicago (which CPD records confirm). Individual E will testify that the information contained in the search warrant complaint—for which Salgado was the affiant—was materially false.

Individual E will further testify that she was away from her residence when the search began, but arrived home soon thereafter. When Individual E returned home, Elizondo and Salgado were alone in her bedroom. Individual E will testify that, prior to the search, she had at least $800 in cash inside a desk drawer in her bedroom that she kept inside an envelope marked "rent." Individual E will testify that she last saw the money inside the envelope just hours before the search of her residence, and that she locked her bedroom door when she left her residence. Individual E will further testify that all of the money was missing after the search, and none of it was inventoried (CPD records corroborate that no money was inventoried from this search).

### D. **Officer Testimony**

The government will also offer the testimony of several CPD officers who served on Elizondo and Salgado's gang enforcement unit during the timeframe of the charged conspiracy, including Officers Joe Treacy, Jose Sanchez, and at least two other officers. The government expects the officers to testify that Elizondo and Salgado drove the operations of the gang team, and routinely kept other team members in the dark about day-to-day work. Among other things, these witnesses will testify that Elizondo and Salgado exclusively worked together on preparing J. Doe search warrants, and did not involve other team members. It was common, for example, for Elizondo and Salgado to secure a J. Doe search warrant without giving team members any notice, and only alert other team members about the warrant minutes before it was to be executed. Further testimony will establish that Elizondo regularly insisted on interviewing witnesses and/or arrestees alone (which was highly unusual), and frequently only shared information obtained during the interviews with Salgado. The government expects one officer to testify that, in or around the summer of 2017, the officer overheard Elizondo instructing Salgado to distribute cartons of cigarettes recovered during the search of a residence to confidential informants. The government expects another officer to testify that, in or around November 2017 (around the time Salgado distributed a plastic sandwich bag of marijuana to Individual B), the officer saw Salgado remove a portion of marijuana from an evidence inventory room, place it in a plastic sandwich bag, and leave the evidence inventory room with the marijuana.

31

## V.    COCONSPIRATOR STATEMENTS

The statements between the coconspirators made in furtherance of the conspiracy that the government intends to offer at trial—many of which are set forth above—concern subjects that were integral to the conspiracy and its success, namely, the acquisition of search warrants based on false testimony, the planned distribution of search warrant proceeds to informants, and the concealment of evidence. These statements will be introduced through consensual recordings, intercepted wiretap communications, and the testimony of witnesses and cooperators. This evidence will be further corroborated by video evidence, documentary evidence, historical cell site location data, and other evidence.

The specific co-conspirator statements that the government seeks to offer at trial includes statements made by one defendant and offered against the other. For example, the government seeks to admit Elizondo's statements made during the December 18, 2017 meeting between Elizondo, Salgado, Individual A, and CS-1, detailed above at pages 18-20, against Salgado.  The government further seeks to offer Elizondo's statements to CS-1 during the December 28, 2017 phone call, detailed above at pages 23-24, against Salgado.  Additionally, the government seeks to offer all statements made by both defendants in the January 29, 2018 wire intercepts, detailed above at page 29, against both defendants (as opposed to the each defendant's own words being offered against the speaker only, and the other side of

the conversation coming in for context).[5]

Additionally, the government seeks to offer as co-conspirator statements out-of-court statements made by Individuals A and B in furtherance of the conspiracy. For example, Individual A's statements to CS-1 during October, November, and December 2017 (detailed above at pages 11-13) concerning the prior occasions in which Individual A had served as a J. Doe affiant for the defendants are admissible against both defendants, because they were made for purposes of recruiting CS-1 into the conspiracy. *See Cruz-Rea*, 626 F.3d 929, 937).

Further, Individual A's statements during the December 18, 2017 meeting with Elizondo, Salgado, and CS-1 concerning the plans to misappropriate property recovered during the search of the Subject Apartment (*e.g.* "They gonna give us our chop off of everything we do")[6], and Individual A's statement to CS-1 on December 19, 2017, that Individual A was going to swear out the J. Doe warrant since CS-1 refused to appear ("I'm gonna do it now, you took too motherfucking long"), are admissible against both defendants, as they were plainly statements made in furtherance of the charged conspiracies.

Additionally, all conversations between Individual A and the defendants

---

[5] As set out above, most of defendants' statements in the January 29, 2018 intercepts consist of questions and commands, which generally do not constitute hearsay. However, some of the questions and commands contain factual assertions. For example, "Just make sure whatever you have in your house isn't there no more," includes a factual assertion that Salgado in fact had something in his home that Elizondo wanted concealed from law enforcement. The government seeks to offer that statement for the truth against both defendants.

[6] CS-1's statements during the December 18, 2017 meeting will be offered purely for context, not for the truth. *See Tolliver*, 454 F.3d at 666.

concerning the other occasions discussed on pages 11-13 in which defendants paid Individual A to act a J. Doe, and/or instructed Individual A to provide false information to judges in support of J. Doe warrants should be admitted under Rule 801(d)(2)(E).

Individual B's out-of-court statements made in furtherance of the conspiracy should also come in for the truth against both defendants. This includes Individual B's statements contained in the intercepted conversations with Elizondo on January 27, 2018 (detailed on page 16), in which Individual B asserted that Individual C (who was then incarcerated) provided Elizondo with information about drug dealing activity at the Central Park Avenue residence (as opposed to the J. Doe affiant), and that Individual B did not serve as the J. Doe affiant for the warrant to search the Central Park Avenue apartment. As explained above, the government will present the false J. Doe warrant that Salgado obtained for the Central Park Avenue apartment, and anticipates Individual B will testify that Salgado told Individual B that he did not want her to stand in for Individual C as the J. Doe affiant because Salgado did not want to pay Individual B—which supports the inference that Salgado, with Elizondo's knowledge and approval, then recruited a different dummy affiant to stand in for Individual C.

All conversations between Individual B and the defendants concerning the other occasions discussed on pages 13-14 in which defendants paid Individual B to act as a J. Doe, or asked Individual B to provide materially false information in support of a J. Doe Search warrant, or asked Individual B to serve as a J. Doe affiant

when Individual B had not provided any information, should also be admitted under Rule 801(d)(2)(E).

The multiple materially false search warrants submitted by Salgado and approved by Elizondo should also be admitted as non-hearsay statements against both defendants on multiple grounds. First, the government primarily seeks to use the search warrants for purposes of demonstrating the falsity of the information contained therein, not for the truth of the matters asserted. Second, to the limited extent that the government will offer the J. Doe warrants for the truth of the matters contained therein—specifically, the identity of the complaining officer (Salgado), and the fact that Salgado appeared before a judge with a J. Doe affiant, and both swore to the veracity of the information contained in the warrant—they are admissible as co-conspirator statements, because the submission of the false warrants was an essential part of both charged conspiracies. The statements are also admissible against each defendant individually under Rule 801(d)(2)(A), because the face of the warrants establish that Salgado drafted them, and associated CPD administrative paperwork that is regularly generated and maintained in connection with J. Doe search warrants establishes that Elizondo approved them as Salgado's supervisor.

The same analysis applies to certain materially false police reports that the government will seek to admit against both defendants, including the false report associated with the January 28, 2018 search of the Subject Vehicle. For the most part, the government will be offering the reports to show the falsity of the information contained therein, as proof of defendants' efforts to conceal their illegal conduct.

However, to the limited extent the government may offer the reports for the truth of the matters contained therein, they are admissible under Rule 801(d)(2) for the same reasons set out in the preceding paragraph.

The government is not detailing every proposed coconspirator statement of each witness or recording (though several of the recordings the government intends to introduce at trial are set forth above) but rather a representative sample of the types statements from each witness and/or recording. Further, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed. Of course, the government is committed to establishing the *Bourjaily* predicates at trial and the ultimate admissibility of coconspirator statements is governed by the trial evidence.

Under the case law summarized above, all of these statements are properly admissible against both defendants as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

## VI.   CONCLUSION

The United States respectfully requests that this Court find, based upon this proffer, that the coconspirator statements outlined in this proffer are admissible against defendants Elizondo and Salgado pending the introduction of evidence to support this proffer.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:  *s/ Sean Franzblau*
Sean Franzblau
Ankur Srivastava
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5305